Armando Fong NAJARRO and
Compania Financiera Libano,
S.A., Plaintiffs–Appellants,

v.

FIRST FEDERAL SAVINGS AND LOAN
ASSOCIATION OF NACOGDOCHES,
TEXAS, Defendant–Appellee.

No. 89–2941
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Dec. 4, 1990.

Keith G. Fabrizi, Houston, Tex., for plaintiffs-appellants.

David L. Burgert, Warren W. Harris, Porter & Clements, Houston, Tex., Robert B. O'Keefe, Adams, Belanger, Atherton & O'Keefe, Nacogdoches, Tex., for defendant-appellee.

Before CLARK, Chief Judge, KING and GARWOOD, Circuit Judges.

CLARK, Chief Judge:

This is a conversion action by Armando Fong Najarro (Najarro) and Compania Financiera Libano, S.A. (Libano) against First Federal Savings and Loan Association of Nacogdoches, Texas (First Federal). The jury absolved First Federal. We affirm.

## I. Facts.

William H. Simmons (Simmons) and John C. Trotter (Trotter) were partners in an oil and gas venture. Trotter, a Houston tax attorney, proposed that the partnership could obtain loans secured by certificates of deposit (CDs) purchased by Najarro, a Guatamalan national, and Libano, a Panamanian corporation. By investing in CDs issued by American banks, Najarro and Libano would be able to bring large amounts of money into the United States tax free.

In 1980, Najarro and Libano invested in various CDs in Najarro's name. Najarro, acting for Libano, authorized Trotter to pledge those CDs as collateral for loans to Simmons who used the proceeds to acquire oil and gas properties. Ultimately, the loans totalled more than $1,150,000. In 1981, Simmons formed Simmons Exploration Company and transferred the properties to the corporation. In 1983, Simmons Exploration Company transferred stock to members of Trotter's family.

By 1984, there were six loans in Simmons' name at four different financial institutions in three different cities. Six CDs purchased by Najarro and Libano secured the loans. The net difference, or "spread," between the interest rates charged by the banks on the loans and the rates paid by the banks on the CDs was between 1½ and 2 percent. Simmons Exploration paid the interest rate spread.

Simmons and Trotter decided to consolidate the six loans at one financial institution in order to obtain a 1 percent spread. They chose First Federal in part because Simmons lived in Nacogdoches and, from there, managed the oil and gas properties. By consolidating the loans in a Nacogdoches bank, Simmons could handle the financial transactions easily.

In December 1984, Simmons and Trotter met with First Federal officers to discuss transferring the loans. First Federal loaned Simmons money to purchase CDs in Najarro's name which were pledged to secure the loans to Simmons. First Federal retained possession of the CDs. This arrangement was consistent with the procedures used by Simmons and Trotter at the prior financial institutions.

In connection with the arrangement at First Federal, Najarro signed a Power of Attorney authorizing Trotter to act for Najarro. On behalf of Najarro, Trotter signed an "Owner's Consent to Pledge" authorizing Simmons to pledge Najarro's CDs. The Owner's Consent to Pledge stated that any collateral:

... will also be subject to disposition in accordance with the directions of [Simmons], including without limitation sale of collateral and application of the proceeds of sale to payment of any obligation or delivery of the collateral to

[Simmons] upon payment of the obligations.

The parties did not fill in the space provided on the form for a description of the collateral. Testimony indicated that the parties left the space blank so that the Owner's Consent to Pledge would serve as a "blanket" consent for all existing or future CDs created at First Federal. Trotter later signed additional Owner's Consent to Pledge forms covering future CDs.

In 1986, Simmons instructed First Federal to retire his loans by cashing out the CDs. He explained to First Federal officers that the revenues from the oil and gas properties had declined so that they could no longer cover the 1 percent interest rate spread and that he and Trotter had agreed that the loans should be paid off by cashing out the CDs. At that time, all of Najarro's CDs had been combined into two CDs worth $760,850.20 and $392,424.40. First Federal thereafter cashed out the two CDs and discharged the loans.

Najarro and Libano sued First Federal for conversion of the CDs. The jury, in answer to special interrogatories, found that Simmons possessed express and apparent authority to instruct First Federal to cash out the CDs and that First Federal did not wrongfully convert them. Najarro and Libano make the following arguments on appeal: (1) Simmons lacked express or apparent authority, (2) Simmons' agency ended when he acted adversely to his principal's interests, and (3) the Texas statute of frauds makes the pledge unenforceable.

## II. Issues.

### A. *Express and apparent authority.*

The jury found that Simmons had express and apparent authority to instruct First Federal to cash out the CDs. Najarro and Libano argue that the evidence of express and apparent authority was insufficient to support the jury's verdict. Although the existence of an agency relationship is most often a mixed question of law and fact, we review based on the clearly erroneous standard applicable to the fact issues raised on this appeal. *American*

*Int'l Trading Corp. v. Petroleos Mexicanos,* 835 F.2d 536, 539 (5th Cir.1987).

■ Trotter had Najarro's Power of Attorney to transact business regarding the CDs. Testimony at trial indicated that the parties intended the Owner's Consent to Pledge to cover all CDs involved in this case. The jury was entitled to believe that the parties left the description blank so that Trotter would not have to sign a new form each time a CD was created or "rolled over." In addition, several bank officers testified that, during the initial conversations with the bank, Trotter indicated that Simmons was his agent and had authority to transact all of Najarro's business at First Federal. Given the breadth of the language in the Owner's Consent to Pledge, the positions of the parties, and the testimony regarding representations to bank officials, the jury's determination was not clearly erroneous.

■ The jury also found that Simmons had apparent authority. Under Texas law, "[a]pparent authority is based on the doctrine of estoppel, and one seeking to charge the principal through apparent authority of an agent must establish conduct by the principal that would lead a reasonably prudent person to believe that the agent has the authority that he purports to exercise." *Biggs v. United States Fire Ins. Co.,* 611 S.W.2d 624, 629 (Tex.1981). In this case, the Owner's Consent to Pledge, the testimony regarding Trotter's representations to the bank officers, and Trotter's actions manifesting his delegation of authority to Simmons make the jury's finding that Simmons had apparent authority not clearly erroneous.

Appellants argue that a single prior transaction is insufficient to form a pattern of conduct suggesting apparent authority under Texas law. They cite *Ames v. Great Southern Bank,* 672 S.W.2d 447 (Tex. 1984), and *John Chezik Buick Co. v. Friendly Chevrolet Co.,* 749 S.W.2d 591 (Tex.App.—Dallas 1988, *writ denied*). They therefore claim that Simmons could not have had apparent authority because Simmons never before used the CDs to cancel his debts. This argument is merit-

less. The cited cases considered whether one prior transaction by itself could sufficiently demonstrate apparent authority. They do not hold that proof of more than one prior transaction is necessary when there is other direct evidence of apparent authority.

█ In their Reply Brief, appellants argue for the first time that various Texas cases and sections 9.503 and 9.504 of Texas' version of the Uniform Commercial Code prohibit a creditor from taking possession and disposing of a debtor's property before default. In the absence of manifest injustice, this court will not consider arguments belatedly raised after appellees have filed their brief. *Abbott v. Local Union No. 142*, 429 F.2d 786, 788 (5th Cir.1970). Rejection of the issues so raised here—that First Federal had no right to dispose of collateral before default and that Texas law requires pledgees to retain collateral pledged until the pledge purpose is fulfilled—do not involve manifest injustice.

**B.** *Agent's Actions Adverse to the Principal.*

█ Najarro and Libano argue that Simmons' instruction to cash out the CDs was contrary to Najarro's interests. They cite *Remenchik v. Whittington*, 757 S.W.2d 836 (Tex.App.—Houston [14th Dist.] 1988, no writ) for the proposition that "where an agent binds himself to a course of conduct antagonistic to the interests of his principal, such breach of duty, *ipso facto*, terminates the agency unless condoned by the principal with full knowledge." *Id.* at 839 (emphasis in original). Thus, they say, Simmons terminated his agency by acting contrary to his principal's interests.

The *Remenchik* case makes an exception for actions condoned by the principal. *See id.* The jury found that Simmons acted with express and apparent authority. The evidence forming the basis of the jury's finding—the broad grant of authority in the Owner's Consent to Pledge, the representations by Trotter, and Trotter's apparent delegation of authority to Simmons—all support a finding that Najarro, through

Trotter, condoned Simmons' conduct by granting him authority to act as he did. Indeed, the Owner's Consent to Pledge states that the collateral was subject to disposition "in accordance with the directions of [Simmons], including without limitation sale of the collateral and application of the proceeds of sale to payment of any obligation...."

Moreover, the rule that agency terminates when an agent acts contrary to the principal's interests applies to the relationship between the agent and principal. It does not negate apparent authority. A third party is entitled to rely on an agent's apparent authority even after the agent's actual authority has ended. *See Sorenson v. Shupe Bros. Co.*, 517 S.W.2d 861, 866 (Tex.Civ.App.—Amarillo 1974, *no writ*). This case involves business transactions in which the interests of Simmons, Trotter, Najarro, and Libano overlapped. We will not disturb the jury's finding that Simmons acted with apparent authority.

**C.** *Statute of Frauds.*

█ Najarro and Libano argue that the Owner's Consent to Pledge was unenforceable due to the operation of the Texas general statute of frauds which states that "a promise by one person to answer for the debt, default, or miscarriage of another person" is not enforceable unless the promise is in writing and signed by the party to be charged. Tex.Bus. & Com.Code Ann. § 26.01(b)(2) (Vernon 1987). Appellants maintain that the Owner's Consent to Pledge, which was in writing, does not comply with section 26.01 because it does not contain a description of the collateral. They point out that none of the consent to pledge forms signed by Trotter specifically apply to the two CDs that First Federal cashed out pursuant to Simmons' instructions. Thus, appellants contend that any agreement to pledge the two CDs that were cashed out is unenforceable.

Appellants' argument misses the mark. Section 26.01 does not apply to this case. Initially, we note that First Federal is not seeking to enforce the Owner's Consent to Pledge. Typically, a party invokes a stat-

ute of fraud as a defense to an action that seeks to compel the performance of an alleged promise. It is used as a shield, not a sword. In this case, however, appellants attempt to use the Texas general statute of frauds to render unenforceable the pledge agreement which forms the basis of First Federal's defense to appellants' conversion claim. Appellants argue that First Federal's exercise of control over the collateral was wrongful because the statute of frauds renders the pledge agreement unenforceable. First Federal, however, is not invoking a court's power to compel Najarro and Libano to perform under the pledge agreement. Rather, First Federal maintains that it did not convert the collateral because the pledge agreement allowed it to cash out the CDs at Simmons' discretion. The Owner's Consent to Pledge evidences that First Federal did not wrongfully exercise control over the CDs.

Moreover, section 26.01 does not apply to this case. As the cases cited by appellants demonstrate, section 26.01 applies mainly to guaranty agreements in which a creditor attempts to hold a third-party guarantor personally liable for the primary obligor's debts. *See, e.g., Block v. Aube*, 718 S.W.2d 914, 915 (Tex.App.—Beaumont 1986, *no writ*) (guaranty); *Metro Siding Distribs., Inc. v. Master Shield, Inc.*, 717 S.W.2d 455, 457 (Tex.App.—Fort Worth 1986, *writ ref'd n.r.e.*) (guaranty); *Bass v. Fouts*, 400 S.W.2d 15, 17 (Tex.Civ.App.—Texarkana 1966, *writ ref'd n.r.e.*) (guaranty). Today's case, however, involves a pledge in which the creditor, First Federal, had possession of the collateral at all times. Chapter Nine of the Texas U.C.C. specifies that a security interest is enforceable against a third party without a written security agreement when "the collateral is in the possession of the secured party pursuant to agreement. . . ." Tex.Bus. & Com.Code Ann. § 9.203 (Vernon Supp.1990). The comments to section 9.203 explain that "[w]here the collateral is in the possession of the secured party, the evidentiary need for a written record is much less than where the collateral is in the debtor's possession." Texas Bus. & Com.Code Ann. § 9.203 comment 3 (Tex. UCC) (Vernon

1968). Appellants necessarily admit that the provisions of Chapter Nine govern the validity of the pledge in their belated argument that sections 9.503 and 9.504 govern the disposition of the collateral prior to default. We agree with the district court's determination that First Federal obtained an enforceable security interest in the collateral by possession. The Owner's Consent to Pledge reflects the terms of the agreement. Thus, First Federal can rely on the consent form to show that the cashing of the CDs was not a wrongful conversion.

Finally, Najarro and Libano assert that a consent to pledge without a description of the collateral is void on its face. Our determination that First Federal obtained an enforceable security interest in the CDs by possession deprives this argument of merit. The comments to section 9.203 state that the section "dispenses with the written agreement—and thus with signature and description—if the collateral is in the secured party's possession." Tex.Bus. & Com.Code Ann. § 9.203 comment 3 (Tex. UCC) (Vernon 1968).

### III. Conclusion.

The judgment of the district court is AFFIRMED.